Seeing counsel's name reminds me that because of the confusion at the outset of our calendar, I neglected to say how much Judge Graber and I appreciate Judge Rhodes sitting with us today. I have an A in my name, though. So now we'll hear from— I was born in Montana. —from you, Mr. Rhodes. Thank you, Your Honor. Good morning. I'm John Rhodes from the Missoula office of the Federal Defenders of Montana. I represent David Tacke. Mr. Tacke's sentence is riddled with errors. Most glaringly, the district court made no effort to value the stocks, the shares that were at issue. Well, there was no value. Excuse me? There was no evidence of value. Yes, there was, Your Honor. Three people testified at the sentencing hearing. An accountant who had audited the company who said that it had value. That there was value, but he didn't say what it was. And the last evidence that I'm aware of of any value was from, what was it, December of 2001 or thereabouts, where the accountant said that there were negative $28,000 of assets and $3-plus million worth of liability. That was the financial officer for the company, Your Honor, as opposed to the auditor, the accountant who audited the company. The accountant who audited said there was value. But what? I mean, those are words. I mean, there's value. What value? There could be two sources to look at, Your Honor. Recently, somebody who had invested in the company sold their shares, and the district court made no effort to inquire into the value of that transaction. Probably because it would have been an illegal transaction. How would that be illegal for somebody to sell? There's nothing to sell. Well, somebody did sell their shares. And also, Your Honor, you're making the same mistake, with all due respect, that both the government and the district court made. They're saying, Defendant, you show us the value. The burden is on the government to prove loss. And here, an auditor said there was value, a securities legalist. I'm repeating myself, but just lest you don't have a shot at me in my mistake. To say there's value doesn't make it so. Well, the president of the company, not Mr. Tacky, but the current president of the company at the time of sentencing, came in and said we are a going concern. If there's a going concern. Fortunately, the concern that was going, to the extent it's going at all, is a different entity, Philly Contract Inc. or Optex, from the entity in which the investors put their money. And never mind all that. The investors, and if I understand it correctly, the district court's theory here was that the investors gave $1.8 million to Tacky for his phony corporation that was set up essentially to be used as a personal account. And that's the loss. That's what the district court determined the loss to be, yet it didn't look at how much of that money flowed back into the company, Venutech, which was still operating, which the president said was a going concern. He said that the shares had appreciated since the investments were made by the individual investors, and the district court made no effort to value the company. You see, it wouldn't have appreciated if the money was pocketed. That's all. They may have appreciated, but not as much as not. There's no evidence to me that they appreciated. I mean, I can't look at this and say that they did or didn't. It's not an open market, fraud on the market kind of case where you've got a measure of what shares are being exchanged for. You have three experts saying that there's value, and one of them said there's appreciated value. The government's expert, the FBI agent who tracked the flow of money, said that Mr. Tacky, through Quell Corporation, which is the corporation that the district court's based its loss finding on, invested roughly $950,000 back into Venutech, yet the district court made no accounting for that. Into Smith Barney accounts, into Merrill Lynch accounts, into a whole bunch of other accounts. You're confusing the facts, Your Honor. The FBI agent testified that $950,000, that's an approximate number, was invested back. A good portion of that went into trading accounts. That's separate. There was $1.6 million roughly. I've gone down the entire accounting of the Kell account, and I didn't add it up exactly, but eyeballing it, it's very clear that a whole bunch of that money went into that was supposedly transferred went into trading accounts, never mind the fact that it didn't begin to get transferred over until after the fraud was about uncovered. Your Honor, the FBI agent testified that $950,000, that's an approximate number, was invested from Quell back into Venutech. There was no accounting for that at the sentencing. As for the money invested into Quell, a few of the investors said that when they invested, they understood that money would be used for Venutech, which was the company that was manufacturing, marketing, was in this binoculars business. Quell was Mr. Tacky's personal corporation to hold his Venutech shares. A few investors said, we thought when we purchased Venutech shares from Quell, that that money was going to Venutech. Most investors said, overwhelmingly, the number of investors said, we understood that when we purchased shares from Quell, that that money was going directly to Mr. Tacky because that was his own personal company. And the district court, again, ignored all that evidence that was unrefuted and just said everything invested in Quell was a loss. The problem is your client lost the trial. And the district court must have said that a dozen times during the course of the sentencing, that, you know, you lost the trial. And so that means there was a fraudulent scheme. And that means that part of that fraudulent scheme was popping $1.8 million and using it for suits to pay off your divorce, for cars, for golf, for trading accounts. And just blowing that much of the shareholder's money, or at least a good part of that. Beyond the grand jury issue, Your Honor, I'm not here saying that my client didn't get a fair trial, that he should have a new trial. I'm saying primarily that his sentencing is riddled with errors because the district court just took this broad brush approach. You lost the trial. Therefore, we're going to ignore all the testimony at trial. We're going to ignore the testimony at sentencing, which the district court only entertained after it made its guidelines determinations, which is problematic in and of itself. That's unreasonable to do that. And the district court just had this broad brush approach to sentencing. If you compare its loss determination with its number of victims determination, with its restitutions determinations, those all conflict with one another. They don't have to be the same, huh? They don't have to be the same as a matter of law. You're correct, Your Honor, as a matter of reason. Well, in part, though, the intended loss can be a measure of loss. Restitution has to be based on actual loss. You may have intended to get $10 million, but if you actually only succeeded in getting one, you only have to pay back the one. So I don't understand why they would have to match. I guess I have the same problem. We need to look at the facts of the case, Your Honor. The district court disclaimed that intended loss was an issue because the fact is Mr. Kacke, despite the fact he was convicted of fraud, worked tirelessly, effortlessly, to make this company a success. He didn't try to sink the company. You have to look at the actual loss, which, again, goes to there needs to be some valuation of what the investors actually received in this ongoing business, and you have to compare that with the restitution has to be what's directly caused by the fraud, and that's what the district court didn't do here. It just confused fraud slash money invested with all that money must be lost, and it's a lot more complex and nuanced here. And what I hear the court suggesting this morning and what the government keeps saying in its briefs is it's the defendant's burden. It's not the defendant's burden. We raised the issue of valuation. This company is ongoing under the Zolt decision recently issued by the court. There's got to be an inspection of the actual loss. You agree. No one said how much the value is. They said it has value, but they don't say how much. The only, and it wasn't. Is that correct? Yes. Mr. Rasmussen, the current president, said that there was appreciated value. Isn't that really what's being talked about when there's a question of burden? It's not really the burden of proof. If someone says, you know, investors gave $2 million. I'm making these numbers up just because round numbers are easier for me to think in for theoretical purposes. So you know how much was invested. And if someone comes in and simply says, and the theory is it's worthless, so the entire amount of invested money is a loss. Is it enough for you to just come in with witnesses who say, well, it's not? Do you understand what I'm saying? Because if the question is, was it worth $2 million, and the only thing that your witnesses say is, I don't agree with that, where do you go with that? Well, the most important fact is the business was still operating, and it was thriving more at the time of sentencing than it was at the time of the law. You're missing the point of my question, though. If there is a number going in, the government has demonstrated a number, and you're saying, well, it's still their burden because we called it into question. But is it really called into question when the evidence is simply, we don't agree with that number? There's no other number there. I would have approached it differently, Your Honor. I would have brought in a securities expert, somebody from the business school, most likely in Missoula at the Graduate Business School, to come in and value this company through some sort of forensic account. But that wasn't done. That was not done. But the mistakes that were made still don't mean that the guidelines were complied with. And, for instance, using the $2 million, the amount of loss determined by the court was $1.6 million, yet from investors who were solicited by the probation office, certainly had worked hand-in-hand with the government throughout this investigation and legal proceedings, only 36 of them stepped forward and said, I am a victim. And those 36, their invested amounts corresponded to roughly $950,000. I think it was $932,000 more specifically. Yet the district court vaulted from that number of self-proclaimed victims and $900,000 of investment to $1.6 million of loss. And so even accepting that maybe the defense didn't do enough to prove valuation, there's still error. And with respect to restitution, the restitution figure was the $900,000 that the people who identified themselves as victim, who had said we invested this much money, that's what the district court relied upon for restitution. The conflict between the loss calculation for the guidelines and the restitution figure is the district court said, what I'm going to consider for guidelines loss, which has to be actual loss, is the money invested with QUEL, $1.6 million. If you wanted to equate the two, then it should have been $3.6 million. That was the total money invested. Well, of course. But if you really wanted to equate them, that would be the equation, whereas the district court, in Tacky's favor, said, no, no, no, no. I'm just going to look at the QUEL loss, not the actual total investment. And in doing that, valuation aside, ignored that the FBI agent said $950,000 was invested by QUEL back into Venutech and ignored that the self-identified victim said, we only invested $900-something thousand dollars. And of that $900-something thousand dollars, not all of that went to QUEL. Some of that was used to purchase shares directly from Venutech. And that's why I'm saying, as a matter of fact, as a matter of being reasonable, these guideline calculations conflict with themselves and then also conflict with the restitution amount. And you see that with respect to the number of victims determined by the district court. The district court vaulted from $1.6 million, excuse me, the $900-something thousand dollars for restitution was linked to basically 36 people and counting husbands and wives as a single investor who said, we are victims. But then when it came time for determining the number of victims, the district court said there's 266 victims. And again, that shows that the loss determination for guideline amounts conflicted with the victim determination, conflicted with the restitution determination. Do you accept that 266 figure of number? The only place I could find it was in paragraph 22 of the pre-sentence report. Absolutely not, Your Honor. It was objected to at the trial level, which places the burden on the government under the Amaline en banc case and longer in the rule. They say they got it from the auditor's office for the state of Montana. And therefore, there's an issue that it's correct. But if it's objected to by the defense under Rule 32 in the law of this court, the government has to come in with more evidence. It didn't do that at sentencing. The only evidence that I think that it did present at sentencing was the probation office solicitation from potential investors. Are you a victim? And 36 people said they were. So if the court had said there were 36 victims, I would not be arguing that issue today. Some people embarrassingly got conned and they won't report back. That's part of the problem. If I own shares in this company right now and I wanted to sell them to somebody, could I take this certificate that's printed up on a defendant's computer that hasn't been registered anywhere, and could I legally sell the shares? Yeah, you could transfer. They're held in book entry form, which I think is the common standard for holding shares today. It's how I own my personal stock holdings. So I don't know the exact legal process to transfer book entry holdings, but it could be done. Legally, I should. Yes, it could be done legally. And that's another issue with respect to valuation. The securities expert who testified at sentencing, albeit after these determinations were made, and the president of the company said, we want to rescind. We want to buy the shares. And after the fact. And there's nothing to, what are they going to rescind with? $400 worth of profit from Corsadian? The company said they wanted to do it. And, again, there was an answer. Why don't they? Then they wouldn't have to make restitution. Excuse me? Why don't they just do it? Instead of saying, we're going to do it. I represent Mr. Tacky. He's in prison. I'm not corporate counsel, Your Honor. It's like checking the mail. Well, I'll reserve the rest of my time. Thank you. Okay, thank you, Mr. Rhodes. May it please the Court, Your Honors. I think there was something about this historic setting today that caused me to reflect that I've actually been appearing regularly before this Court for a little over 20 years. And, again, today it is a distinct pleasure and honor to be here. I was trial counsel for the United States in this case. And for Mr. Rhodes to assert that the trial court sentencing proceeding is riddled with errors, certainly indicates that he is ignoring the record we created at trial and the record that Judge Molloy relied on in fashioning this sentence. As Judge Reimer has noted, throughout the sentencing proceeding, Judge Molloy reflected on the trial record, talked about the trial record, and the record that we made at trial and that we presented to this Court. Where do you get the number of victims other than that paragraph 22? Well, there was some testimony by the Montana State Auditor's Office expert, Lynn Eakin, that we used. And she talked about it, page 1243 of the record, of approximately 200 persons being identified. That information became more refined as the trial progressed and as the probation office did their investigation. And we did come up from the Montana Auditor's Office with the 266, 13 states total figure. So there was some indication at trial, based on the testimony, that it was around 200. How did that information come in, what the auditor's office did? Did it come in just as a probation officer or come in during trial? Well, Ms. Eakin's estimate at trial was around 200. Well, if it's 200, then it lowers the number of points, right? I understand that. I understand that, Your Honor. And so when we get around to- Then it should be lower? It should not be lower because we do have substantial evidence, certainly a preponderance of the evidence, that the number's 266. We had a list that we offered from California as well that listed about 41 investors. Just from that Morgan Hills cadre of investors, that's what we attached as tab G. And then we had the whole Montana list of investors. That was Ken Barton's group as well offered at trial. And you can see in these- Those don't add up to 266, though, those two items? No, they don't. I can't tell you that they add up to 266, Your Honor. So my question is, really, what is the collaboration as to the hearsay testimony coming from the auditor's office? Well, I think, really, when you're looking at the district court's burden to establish these factual issues, the court needs to simply make, at least with respect to amount of loss, a reasonable estimate. Now, the number of victims, again, we go back to a preponderance of the evidence. And the court was- We offered plenty of evidence regarding individual investors. And those tabs that we made, excerpts of record, we can see the money coming in to quell victim by victim by victim. And the only complicating factor, I think the reason it became somewhat ambiguous as to the exact number was the way Tacky set this up was to have his friends, like Curtis Barton, solicit at his hairdressing salon and collect all the money and send it to Tacky as one investor. So the Curtis Barton group, while he's listed as one investor under perhaps Tacky's records, we also have the fact that that, in fact, was 41 separate investors, based on the records that we've shown. So this is what the district court was faced with in trying to determine an exact number of victims. And the best information we had was from the state of Montana auditor's office that was submitted to the pre-sentence writer. And I think Egan's testimony also, at some point, was that it was in excess of 200, not that there were 200, but in excess of 200. It was an estimate on her part during the course of some of her testimony, yes. And then the official records were submitted to the PSR writers afterwards. And I never sensed, really, that Tacky took the position of sentencing, that the number of victims, 266, was wrong. That's the way we responded in our brief, was Tacky's never disputed that number. What he's always said is, there's no victims. Right, because it was worth money and it's a going concern, all the arguments we heard today. So really, the number of victims was not placed into dispute about the number of victims. Really, his position was, there's not a victim. These people are all going to be rich someday if they just follow me. So I think that the district court properly made and had enough evidence to determine that there was at least 250 victims, based on the records of the Montana State Auditor's Office. I think that's a reasonable position for the district court to take, and that enhancement was properly applied. One of the things that the district court did have the benefit of, that perhaps Mr. Rhodes does not, was the big picture of this case. And as we outlined in our brief, this is strike three for this Defend Act. He's been making a life career of bilking people with this same idea, starting in 1985 with Sports Eye. When that failed, it became Binoptic International in 1994. And then when that failed and he's completely broke, has no money left, he started up again with Binox and Benutech. So this concerted effort throughout his life, as well as all the serious and detailed documentation that we offered at trial, gave the district court the factual background to make all the factual determinations and all the enhancements that were applied at sentencing. Did you proceed in the case on the basis of no registration or on the basis not full disclosure, or both? Well, Your Honor, I think, as I explained to the jury in my opening statement, as I explained to the jury during closing arguments, and the district court during the course of the jury instruction settlement conference, these two counts, counts one and two that allege mail and wire fraud, describe the scheme as selling or offering for sale unregistered securities, thereby avoiding the reporting requirements. So the scheme, as Mr. Tacky well knew, since this was his third time around the block in Montana, the scheme was to solicit as much money as possible without having to disclose to the investors what he was really going to do with the money. But the fact that it wasn't registered is not in the court's instructions, right? You know, the judge did actually make instructions on these exemption requirements. I objected to those. But he did give the jury some instructions about the application of certain exemptions under Montana law. The defendants requested those, and he did give some instructions on how the exemptions might apply. But we did always characterize those, whether or not these were registered, as a red herring, because the scheme was to sell these unregistered securities so that he avoids the reporting requirements. And he could have done that in any number of ways, one of which is to not register them, another of which is, I don't know, to alter pieces of paper. I mean, I'm sure there are many other ways to do it. I agree, I agree. And what he had learned through that 1985 contact, remember 1985 the state of Montana's office actually had direct contact with Tacky, and they said, look, you can't sell, you can't give promissory notes, you can't sell to ventures unless you register these securities to the state of Montana. His next effort is on the Canadian Stock Exchange, and then his next effort is back in Montana. And the reason the reporting requirements are important is because if he had actually registered these, the state of Montana would have been on notice that Tacky was back in Montana doing business. And those registration requirements require him to tell investors, look, I'm going to take your money and spend it on my girlfriend, or I'm going to take your money and blow it on the stock market. And all the investors that testified during the course of the government's case said, I never would have made this investment had he told me what he was really going to do with the money. And that was the essence of the fraud here. And those registration requirements are in the law to protect the relatively small-time investors that made up the substantial number of investors victims in this case. And so the failure to register really was the manner in which Tacky was able to dupe so many investors slash victims in Montana, because then he didn't have to follow the requirements. The state of Montana wasn't aware he was around. And he obtained $3.6 million by lying to people in that manner. Your Honors, it seems like I may have addressed the issues of concern to the Court. I'd be happy to answer any questions you have. If there aren't any questions, I think I have fully addressed the grand jury issue in my brief as well as the reasonableness of the sentence, and we'll stand on our briefs in those regards. I don't think we have any further questions. Thank you, Your Honors. Thank you, Your Honor. The district court's loss ruling presumes that the stock of the company is worthless. The government didn't get up here and explain why it's worthless. It's their burden of proof to carry the district court's valuation. And the district court started from the premise when it laid out its possibilities that every premise was based upon a worthless share. Yet it's not worthless. The company is still going. Also, the government spent most of its time talking about the number of victims. What it didn't explain is how the district court's incongruent rulings with respect to loss, victims, and restitution are consistent. So even internally within itself, the district court's contradicting itself. Half of the money invested was the guidelines loss. When it came to the number of victims, every investor is the district court deemed to be a victim. When it came to restitution, the district court said, well, we're going to limit restitution to the people who actually step forward and self-identify themselves. Which was quite a bit to your client's benefit. I mean, it seems like you're complaining when he ratchets downward each time, more or less for your client's benefit. Well, what I'm saying is it's erroneous when it's inconsistent. And the reason it was to my client's benefit is because lots of people stepped forward and said, we are not victims. We have a share in a company that's going forward. And one person put it best, you know, if it becomes the next Google, I'm certainly going to take my money. The PSR indicates that the value of the VTS stock is $1,740,000. Yes. Where did that figure come from and why isn't that the value of the stock? That came from Mr. Tacky, who still has shares in the company. So that would be another basis to value the stock. And it was somewhat ironic that the government brought that up at sentencing and then the district court threw that back at Mr. Tacky's face and questioned why he qualified for appointed counsel when the district court had already ruled that the stock was worthless. And with respect to the numbers of victims, a victim under Note 1 of 2B1.1 has to be someone who sustained actual loss. So if every person that invested was a victim, then the district court, you're right, Judge Graber, the district court's loss ruling should have been $3.6 million. Do you want us to tell him that? No. The government hasn't cross-appealed. We're the ones that appealed. And, again, our basic point is the district court has confused investments and fraud with loss. It's much more complex and nuanced than that. The Zolp case explains that. The McAlpine case, which is cited in our brief, how the Tenth Circuit makes the same point with respect to restitution. And, moreover, Your Honor, if you look at the district court's rulings, they are internally inconsistent. And for all those reasons, we request that the court reverse Mr. Tacky's sentence and remand for full resentencing. With respect to the grand jury issue, that's an issue that's best presented on the briefs. The bottom line is there's a very suspicious sequence of events here. The government indicts in December. The Omar case involving the same U.S. Attorney's Office, the Missoula office of the United States Attorney's Office in Montana, is counsel in Omar. That comes out in January. The defense moves to dismiss the indictment for failing to allege materiality. It's a new grand jury, so it's presented to a whole new grand jury. And we presume that those proceedings are regular. And my point is when you look at the sequence of events, it indicates that something irregular happened because the government, when Omar came out and said we need to reindict, materiality needs to be in there. When the motion to dismiss was filed before the district court saying materiality is omitted, the government then said, oh, yeah, you're right, under Omar, which we were involved in, so we know we need to have materiality, we'll go to the new grand jury. The government resisted the motion to dismiss. And then before Chief Judge Malloy could rule, the government, two weeks before trial, went to a new grand jury and got materiality into the indictment. And under that sequence of events, we would ask that this court remand to the district court to review the grand jury transcripts in camera and ensure that the full elements were presented to the grand jury. You cite a case that suggests that it's a better practice for the judge to review it in camera. Is there any case that says the judge has to? No, Your Honor. It's a discretionary issue with the district court and with this court, Your Honor. Thank you. Thank you, Mr. Rhodes. Thank you, counsel. The matters just argued will be submitted and the court will stand in recess for the day.
judges: Rymer, Graber, Rhoades